**GROVE FRESH DISTRIBUTORS, INC., an Illinois corporation, Plaintiff,**

v.

**JOHN LABATT LIMITED, a Canadian corporation, et al., Defendants.**

No. 90 C 5009.

United States District Court, N.D. Illinois, Eastern Division.

June 9, 1995.

---

1430

Dale R. Crider and Warren S. Radler, Rivkin, Radler & Kremer, Chicago, IL, for plaintiff.

Jos. J. Duffy, Roger Pascal, Joseph Anthony Cancila, Jr., and Aphrodite Kokolis, Schiff, Hardin & Waite, Chicago, IL, for Labatt.

Jeffrey Stone, McDermott, Will & Emery, Chicago, IL, for Everfresh.

Royal B. Martin, Jr., Martin, Brown & Sullivan, and Locke E. Bowman, III, Chicago, IL, for Allen.

### MEMORANDUM OPINION AND ORDER CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZAGEL, District Judge.

The perfect tragic figure, according to Aristotle, is "a man not preeminently virtuous or just, whose misfortune, however, is brought upon him not by vice and depravity but by some error of judgment...." Aristotle, *The Poetics* 238 (Friedrich Solmsen ed. & Ingram Bywater trans., Modern Library 1954). The great heroes of tragedy conformed to the Aristotelian conception of a great man whose unkind fate is precipitated by a tragic "flaw" in his personality. Thus, Othello's downfall was the result of his own jealousy, MacBeth fell victim to his blinding ambition, Lear's insecurity prompted his misfortunes, and Hamlet's tragedy was that of a man who could not make up his mind. John Messina fits the mold of the great tragic figure. His is the tragedy of an attorney who could not keep a confidence.

The confidences Mr. Messina could not keep were protected by court orders of confidentiality. Mr. Messina's past behavior played a pivotal role in the granting of these orders, since it appeared that he would go to any lengths to try his case on the courthouse steps rather than in the courtroom itself. That Mr. Messina sincerely, even fervently, believed in the unremitting badness of the defendants in this case is beyond doubt, as was his willingness to hurt them by disseminating information for purposes of damaging them outside the walls of the courtroom. The orders of confidentiality were meant to prevent Mr. Messina's misuse of the litigation to pursue his own agenda. But the evil to be prevented by the orders was the evil that actually ensued.

Undeterred by repeated court warnings, possible harm to his client's interests, and, apparently, his own fate, Mr. Messina continued to disclose protected information. His propensity to reveal court protected secrets is the Aristotelian flaw which precipitated his present predicament: possible sanctions for contempt and for violations of Rule 11. Mr. Messina stands accused not only of violating this court's orders of confidentially, but for

failing to appear in court as ordered and for making misrepresentations to the Seventh Circuit Court of Appeals. Since the "first essential, the life and soul, so to speak, of Tragedy, is the plot," *id.* at 232, some history is in order.

## Background

Mr. Messina represented the plaintiff, Grove Fresh Distributors, Inc., in two separate but related suits filed against competing orange juice manufacturers for allegedly engaging in a conspiracy to unlawfully adulterate and misbrand orange juice in violation of various federal laws.

Grove Fresh filed the first suit against Everfresh Juice Company in 1989 (*Grove Fresh Distributors v. Everfresh Juice Co.,* No. 89 C 1113)[1] The genesis of the second suit (*Grove Fresh Distributors, Inc. v. John Labatt, Ltd.,* No. 90 C 5009) began when Mr. Messina concluded that Grove Fresh had claims against John Labatt, Ltd.—the parent of Everfresh—similar to its claims against Everfresh. Mr. Messina sent Everfresh's counsel a demand letter seeking payment of claims on 23 August 1990. The letter gave notice that Mr. Messina would file a new complaint on behalf of Grove Fresh if Labatt did not settle.

On 24 August 1990, Labatt presented an emergency motion to seal the new complaint described in Mr. Messina's letter, arguing that the new complaint was an illegitimate attempt to amend the complaint in case No. 89 C 1113 (then 18 months old and nearing the close of discovery). Contending that Grove Fresh's motive in filing this new complaint was "to evade and disregard the earlier rulings made by this Court" in case No. 89 C 1113 on procedural issues and the discovery schedule, Labatt prayed for an order "requiring Grove Fresh to immediately submit its new complaint to this court under seal."

On 29 August 1990 I granted the motion to seal the complaint for case No. 90 C 5009. A key reason behind this decision was Mr. Messina himself. After presiding for the previous eighteen months over case No. 89 C 1113, I was familiar with certain tactics employed by Mr. Messina which I believed were questionable if not reprehensible. Specifically, I was wary of Mr. Messina's repeated attempts to beat the defendants into submission by disclosing materials previously designated as confidential to generate unfavorable publicity for them[2]. I had no reason to believe Mr. Messina would change his methods and every reason to suspect he would attempt to try his latest suit on the courthouse steps as well.

Given the relatedness of the two cases and their litigants, and my familiarity with both, I felt it unnecessary to reiterate in my sealing order for the new case what seemed painfully clear from the lessons, and record, of No. 89 C 1113. The minute order granting the seal in No. 90 C 5009 therefore simply stated:

> Defendants' motion to file case under seal is granted. The complaint and all subsequent pleadings shall be filed under seal until further order of court.

Three days later I heard arguments regarding a motion by Grove Fresh to lift the seal. After a brief colloquy, I stated that the "motion to lift the seal is denied without prejudice to you raising it after we deal with whatever pretrial motions there are with respect to dismissing the complaint." I later denied various motions to dismiss the case, but did not explicitly refer to the emergency motion to seal.

On 1 May 1991 I signed a stipulated protective order "in order to provide protection of confidential and proprietary information

---

**1.** This case was eventually dismissed pursuant to the defendants' successful motion for summary judgment in February of 1992.

**2.** Especially alarming was Messina's propensity to disregard court orders and include documents designated as confidential as attachments to his pleadings (which would then be put into the public record or forwarded to the press). An

emergency motion seeking to restrain Messina from making prohibited disclosures would inevitably follow. *See e.g.,* Minute Order of 10/3/90 Ordering Messina Not to Publish His 10/1/90 Letter to the Press and Ordering Him to Comply With the Court's Ruling; Minute Order of 7/18/90 Granting Motion to Enforce Protective Order in 89 C 1113.

and to facilitate discovery." [3] As Grove Fresh's attorney at the time, and therefore a signatory to the order, Mr. Messina agreed that "[d]ocuments designated as 'confidential' shall be used only for the preparation and trial of this lawsuit, and for no other purpose except as may be required by law or court process."

On 9 October 1991, intervenors in the case moved to vacate the seal. Ordering a fresh round of briefs on the seal's merits, I offered the defendants another chance to justify the seal and identify what it wanted to protect. On 29 November, Everfresh argued that the seal

> was originally ordered in the 90 case at Everfresh's request because plaintiff had threatened to file the action in the public record, if Everfresh did not pay a multimillion dollar settlement, with unsubstantiated scandalous allegations that would damage the reputation of Everfresh and others. Plaintiff's pleadings also incorporate and attach protected confidential information obtained through discovery. Had this court not placed the 90 case under seal, the unsubstantiated, scandalous allegations and information that were subject to the protective order would have been improperly disseminated into the public realm.

I agreed with the premise of this argument. On 20 November 1992, in an order partially granting intervenors' motion, I stated on the record that "the seal order in 90 C 5009 served to effectuate the purposes of the protective order entered in the earlier case," No. 89 C 1113.[4] Thus did I seek to incorporate by reference the protective order in the older case as a justification for the seal in the newer one.

I also put into the record my feeling that lifting the seal on the entire case was problematic, because the existence of the seal may have led the parties to believe that they could file papers containing discovery material that would not otherwise properly be put before the court. Another problem with lifting the seal stemmed from the nature of the complaint. As I said in the order,

> the complaint in this case contains allegations which would, if not filed in court and if untrue, be libelous. Some of those against whom allegations are made are not parties to the record and can never secure vindication. The business records, furthermore, contain information which the law customarily protects [such as] speculation and the unproved, untested conclu-

3. This protective order, similar if not identical to one entered in the earlier case, read as follows:

IT IS HEREBY ORDERED:
1. A party (hereinafter referred to as a "Designating Party") may designate documents it considers to be of a confidential, proprietary or trade secret nature. Such designation can be made by applying a written statement such as "Confidential" or "Subject to Protective Order" on such documents. Such designation can also be made by the Designating Party informing other counsel in writing that certain documents or categories thereof are confidential. If the Designating Party has so informed other counsel of the confidential nature of documents, then the lack of a notation on documents shall not be considered a waiver of the right to seek protection of otherwise confidential information; however, the burden of avoiding confusion or mistake as to what is, or is not, confidential shall always remain with the Designating Party.
2. Documents designated as "confidential" shall be used only for the preparation and trial of this lawsuit, and for no other purpose except as may be required by law or court process. If confidential documents are to be disclosed pursuant to law or court process, the Designating Party shall be given at least 10 days advance

notice, before any party makes the disclosure, to afford the Designating Party an opportunity to object to such disclosure or to seek further appropriate relief.
3. If a party objects to the designation of any document as confidential, the party shall advise the Designating Party promptly, in writing, of the objections and the reasons therefor. In that event, all items so designated shall be treated as confidential material pending resolution of the dispute. If the parties involved fail to resolve the dispute among themselves, it shall be the obligation of the Designating Party to move promptly (i.e., within 10 days of the parties' failure to resolve the dispute among themselves) for a ruling from the Court concerning the confidentiality of the items in dispute. Nothing contained in this paragraph shall alter the burden of proof respecting the confidentiality of materials.
4. All confidential documents and materials containing confidential information shall be returned to the Designating Party at the conclusion of this lawsuit.

4. The stated purpose of that protective order, as well as its counterpart in No. 90 C 5009, was "to provide protection of confidential and proprietary information and to facilitate discovery...."

sions in pleadings filed by lawyers under the loose requirements of Federal Rules of Civil Procedure 8 and 9.

On 21 January 1993, Grove Fresh discharged Mr. Messina as its attorney in the Grove Fresh litigation. On 29 April 1993, case No. 90 C 5009 was dismissed with prejudice pursuant to settlement.

Then, on 1 June 1993 intervenors renewed their motion to vacate the seal. This was denied. Intervenors appealed parts of this denial, which included the issue of whether this court should have issued a decision on the record justifying the seal.

In remanding the case back to me, the Seventh Circuit reiterated that it had yet to find "reversal per se appropriate" where a court had not made a point of articulating its findings and reasoning for entering an order limiting access. *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 898 (7th Cir.1994). The Court of Appeals asked "only that in reaching its decision in this matter on remand that the district court specify the basis for its conclusions."

*Id.* at 899. This decision was issued on 12 May 1994.

Continuing disclosures by Messina in apparent violation of the orders of confidentiality, and the motions that would inevitably follow to try and rein him in, gave me ample opportunity to follow the Court of Appeals request and elaborate for the record the seal's rationale. The first chance I had to do this was actually one month *prior* to the issuance of the Seventh Circuit's opinion. On 8 April 1994, acceding to Mr. Messina's request to clarify the seal order's scope, I discussed the reasons behind my orders of confidentiality at some length:

Mr. Messina has not always been clear in his descriptions to me and perhaps even in his own mind as to what is in the public record and what is not otherwise in the public record and what had been discovered in the course of discovery and which is sealed here.

... [M]y past experience with Mr. Messina leads me to believe that I will then engage in a lengthy set of hearings in which we will have to carefully patrol the border between what came out of the court file and what's in the public arena, and I don't want that to occur. I don't think it's good for the case. I don't think it's good for Messina. I think it will increase everybody's costs.

So my answer to you is that I would advise Mr. Messina not to speak about the case and what might possibly transgress the seal with anybody until we resolve the question of his alleged prior violation of the seal order.

To safeguard undue prejudice to anyone's rights, I laid out a process by which Mr. Messina should proceed before making any future disclosures:

Now I recognize that there may be circumstances in which there is some urgent need for him to consult, and if that occurs, it would be appropriate for him to come in with a petition saying I want to consult with so and so. In fact, I don't even think he has to say who it is he wishes to consult with, but I think he does have to tell me what it is that he wishes to say, and it would be very helpful if he comes in with such a petition, he delineates with chapter and verse what his public record source of these statements are.

So, basically it would be best if he spoke to no one about these matters until we resolve the questions of his liability for violating the seal on the one alleged—or two or three alleged violations that have already occurred without creating a problem for possible violations that I may also have to deal with. And the safety valve that I think I'm giving is that if he wants to show exactly what is in the public record and indicate that this is exactly what he wants to say, that's possible too, because I recognize it may be necessary for him to speak more quickly.

It also is a reason why we ought to move as expeditiously as possible to get at least the question of breaking the seal resolved.

And that's my response to your motion. So I guess in a sense I've granted your motion to clarify. I don't know if you're entirely pleased with the clarification, but I

really think given Mr. Messina's history, that its best for him, best for this case, and certainly best in terms of consuming time with this Court that he hold his piece until the matter here is over, and I've given the one escape hatch in case that that's prejudicial to someone else's rights.

And the profound difficulty here is it's very difficult to erase from your mind what it is that you already know, and it's quite likely—at least it's quite risky that Mr. Messina may think that he's speaking from the public document, but because he hasn't laid out very carefully what he learned from each source, he's going to transgress the order and then we're going to have arguments about exactly what does fall within disclosure and what doesn't fall within the disclosure, and I don't want to get involved in that.

I sought to put Mr. Messina on his guard by giving him notice of the consequences that would follow any future transgressions:

> But the fact of the matter is I can't assign anybody to follow Mr. Messina around, and what Mr. Messina says is what Mr. Messina says. What I am doing is I'm granting your motion for clarification and I'm giving you and your client through you a warning about the further difficulties that might very well be created.[5]

> To simply say, look the judge said you can talk about whatever it is you learned independent of this case is very, very cold comfort for Messina; and were I in his position I would not be charging ahead saying, well, thank God that dispute is over, because in my judgment given both my knowledge of Mr. Messina and what happens in other cases in which he's not involved, it just means the possibility that we're going to have more and expensive hearings.

Even Mr. Messina's then counsel recognized the danger in further disclosures when he expressly agreed with the propriety of increased sanctions:

> THE COURT: What happens if he [Mr. Messina] breaches it [the sealing order] a second time?
>
> MR. MINER: It would be appropriate to impose a more severe sanction on him.
>
> THE COURT: Yes.
>
> MR. MINER: I don't have any doubt of that.

It was not long after this that Mr. Messina once again made disclosures which appeared to violate my orders of confidentiality, and did so, moreover, without following the specific procedure I had laid down on 8 April. Thus on 27 October 1994 I reiterated for the record the relationship between the orders and Mr. Messina's own behavior:

> ... [T]he principal basis for the decision [to impose the sealing order] was the that I had litigation before me in which I had a lawyer for the plaintiff, Mr. Messina, who was convinced—I don't know about the justice of his own client's cause, but convinced beyond a shadow of a doubt, indeed the possibility of a doubt, of the badness of the defendants. And it also seemed to me that Mr. Messina was willing to use not the force of the law, but the force of public relations to beat the defendants into some sort of submission ...
>
> ....
>
> But most of what we could do here depends on the fact that lawyers go about lawyer's business, and they serve their clients rather than their own principal concerns, and that they generally obey orders of court and custom and practice of lawyers regarding discovery materials.

I gained an impression of Mr. Messina very early on that he was not likely to follow the well trod paths of custom. Indeed, I thought Mr. Messina might in fact be reluctant to obey court orders. One of the reasons that the sealing order was so broad was my concern that Mr. Messina would ignore any order that was not broad.

---

**5.** Although my comments were directed to an absent Mr. Messina through his counsel, there is no doubt that they were subsequently read by Mr. Messina, who cited the transcript himself in a letter, dated 20 September 1994, sent to counsel for an intervenor. Mr. Messina admitted in deposition that he had reviewed, understood, and previously discussed the 8 April transcript prior to sending the letter. *See infra* part B.2.

After reading a round of briefs on the continued advisability about keeping case materials sealed, and after engaging in a document-by-document review of all materials under seal and subject to the protective order (a time consuming task given the sheer amount of materials generated during the four plus years of litigation), I asked intervenor's counsel, on 21 November 1994, to draft an order to unseal the case pursuant to my orally stated directions. On 1 February 1995, I ordered the file unsealed.

But although the case was unsealed, I was still faced with documents protected by a valid protective order, as well as confidential materials filed in reliance of the seal. My in camera inspection revealed that for some of these materials continued confidentiality was appropriate.[6] I therefore ordered the particularized redactions of certain words, phrases, names, etc., while allowing public access to most, if not all, of the documents in which the redactions were made.

In response to Mr. Messina's conduct during the course of the litigation, American Citrus Products Corp., and John Labatt Ltd., the defendants in the case, jointly petitioned the court for a finding of contempt and for other sanctions against Mr. Messina. On 3 February 1995, a hearing was held to afford Mr. Messina an opportunity to respond to the following charges:

First, that Mr. Messina is in contempt of court for repeatedly violating the seal and protective order of the 1990 case by his disclosures of confidential discovery materials in a brief filed with Seventh Circuit; in a letter to counsel for intervenors; and in a conversation to a reporter for the New York Times.

Second, that Mr. Messina is in contempt of court for failing to appear before me when directed to do so, a nonappearance for which I had previously issued a rule to show cause.

Third, that Mr. Messina is subject to Rule 11 sanctions for allegedly making false or misleading representations to the Court of

Appeals regarding his status as Grove Fresh's attorney.

Defendants jointly pray that Mr. Messina be substantially fined, required to reimburse them for legal fees and costs incurred from his actions, ordered to refrain from further comment, and required to deposit with the court a substantial sum of money which would be forfeited by subsequent disobedience.

### Contempt: Civil and Criminal

"The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches." *Young v. U.S. ex. rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796, 107 S.Ct. 2124, 2132, 95 L.Ed.2d 740 (1987). Without such authority, the courts would be helpless in the face of open defiance of their orders:

> If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls "the judicial power of the United States" would be a mere mockery.

*Id.*, quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911).

The nature of contempt may be civil, criminal, or both. The enforcement of an order through a civil contempt action is designed to serve either of two purposes: (1) to compel or coerce obedience to a court order; or (2) to compensate the parties for losses resulting from the contemnors non-compliance with a court order. *United States v. United Mine Workers of America*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).

■ While the purpose of civil contempt is essentially remedial, *Shakman v. Democratic Organization of Cook County*, 533 F.2d 344, 349 (7th Cir.1976), the purpose of criminal contempt is primarily punitive, "to vindicate the authority of the court." *U.S. v.*

---

**6.** These consisted of commercially disparaging designations; references to alleged co-conspirators not named as defendants; discovery materials and revealing references to them; post-settlement proceedings; and confidential agreements (i.e., the settlement agreement) that would not have been filed but for the existence of a seal.

*Bayshore Associates, Inc.*, 934 F.2d 1391, 1400 (6th Cir.1991), citing *Gompers*, 221 U.S. at 441, 31 S.Ct. at 498. The same conduct may be subject to both criminal and civil contempt sanctions. *Id.*

▮ To support a federal civil contempt conviction, it must be proved: "(1) that the court entered a lawful order of reasonable specificity; (2) the order was violated." *Matter of Betts*, 927 F.2d 983, 986 (7th Cir. 1991). Criminal contempt requires an extra element be shown: "(3) the violation was willful." [7] *Id.* A jury trial and a standard of reasonable doubt are required for criminal contempt charges.[8] *Young*, 481 U.S. at 798–99, 107 S.Ct. at 2133. The elements of civil contempt must be established by "clear and convincing evidence." [9] *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir.1989).

▮ The critical features in determining whether contempt is civil or criminal are the substance of the proceeding and the character of the relief that the proceeding will afford. *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 631, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988). "If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Id.*, quoting *Gompers*, 221 U.S. at 441, 31 S.Ct. at 498.

The line between civil and criminal contempt, however, is often blurred since

both civil and criminal relief have aspects that can be seen as either remedial or punitive or both: when a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it is also seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order.

*Id.* at 635, 108 S.Ct. at 1431.

▮ Courts have broad discretion in choosing the means to grant such relief. *See McComb*, 336 U.S. at 193, 69 S.Ct. at 500. This includes awarding attorney's fees and costs for preparing and prosecuting a contempt petition, and such fees may include factors such as overhead and support personnel. *Matter of Establishment Inspection of Microcosm*, 951 F.2d 121 (7th Cir.1991), citing *Illinois v. Sangamo Constr. Co.*, 657 F.2d 855, 862 (7th Cir.1981); *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 748 (7th Cir.1976).

## A. The Orders of Confidentiality [10]

▮ At issue before me are three instances where it is alleged that Mr. Messina made

**7.** While it is not necessary in instances of civil contempt for the petitioner to establish that the defendant's violation of the order was willful, *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949), evidence of "willful and intentional conduct is relevant to determine the appropriate remedial relief." *Connolly v. J.T. Ventures*, 851 F.2d 930, 935 (7th Cir.1988).

**8.** In the recently decided *International Union, United Mine Workers of America v. Bagwell*, ―― U.S. ――, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), the Supreme Court suggested that in criminal contempt sanctions, the right to a jury trial and proof beyond a reasonable doubt were now required for (1) "serious" criminal contempts involving imprisonment of more than six months; (2) indirect contempts involving out-of-court disobedience to complex injunctions (especially if elaborate and reliable factfinding is required), and which neither obstruct the court's ability to adjudicate nor pose substantial risk of deprivation from lack of a neutral factfinder; (3) "serious" fines (i.e., $52 million); and for (4)

fines related to widespread, ongoing, out-of-court violations of a complex injunction, thereby making the court police the compliance with an entire code of conduct that the court itself has imposed. *Id.* at ――, 114 S.Ct. at 2556–63.

**9.** Civil contempt sanctions, or those penalties designed to compel future compliance with a court order, do not require a jury trial—just notice and the opportunity to be heard—if (1) the fine is compensatory and coercive (rather than merely punitive); (2) the fine is not compensatory, as long as it is petty and/or the contemnor is afforded the opportunity to purge; (3) the conduct occurring outside the court's presence impeded its ability to adjudicate the proceedings before it; and if (4) the indirect contempts involve discrete, readily ascertainable acts requiring little need for extensive, impartial factfinding. *Bagwell*, ―― U.S. at ―― – ――, 114 S.Ct. at 2557–62.

**10.** The 1990 case was subject to both a sealing order and a protective order. The simultaneous use of a seal and a protective order is not unusual. *See e.g., Leucadia, Inc. v. Applied Extrusion*

prohibited disclosures: in a letter, in a legal brief filed with the Seventh Circuit, and in a conversation to a New York Times reporter. That Mr. Messina made the disclosures at issue is not contested; only that the disclosures violated the orders of confidentiality and therefore are subject to sanctions for contempt.

Mr. Messina has raised several general defenses to the contempt charges regarding the disclosures at issue, both in his briefs and during his testimony at the contempt hearings. These have to do primarily with the scope and interpretation of the orders of confidentiality; the First Amendment; and the underlying validity of the orders. To give context to the cited incidents of ostensibly contemptuous conduct, and for the sake of prolepsis, I examine the scope, constitutionality, and validity of the orders before addressing the specific acts in question.

### 1. Scope

Mr. Messina's primary defense is his assertion that the scope of the orders of confidentiality was so limited that neither the protective order nor the seal prohibited his disclosures. According to Mr. Messina, the protective order prohibited the dissemination of very little. Mr. Messina testified that he did not understand the protective order to prohibit him from revealing the contents of pleadings. Nor from revealing confidential

discovery information such as answers to interrogatories nor answers to requests to admit. Nor from disclosing the deposition testimony of witnesses. Nor from disseminating the contents of documents marked "confidential."

Mr. Messina's interpretation of the seal order is similarly cramped. Mr. Messina testified that he did not understand the seal order as preventing him from revealing the contents of depositions under seal, other discovery materials under seal, or quoting verbatim from sealed materials. The only thing that Mr. Messina believed the sealing order actually prohibited was the public disclosure of the actual pleadings—the physical documents themselves—filed in the case.

█ A determination of contempt requires an order of "reasonable specificity" which has been violated. *Matter of Betts,* 927 F.2d 983, 986 (7th Cir.1991). Whether an order is reasonably specific is "a question of fact to be resolved with reference to the context in which the order is entered and the audience to which it is addressed." *Id.,* quoting *United States v. Burstyn,* 878 F.2d 1322, 1324 (11th Cir.1989).

█ Vital to the context in which the orders of confidentiality were entered was Mr. Messina's propensity to generate adverse publicity for the defendants by disclosing protected materials in order to get them to

---

*Technologies, Inc.,* 998 F.2d 157, 158–59, 167 (3d Cir.1993). While there is a definite overlap between the two types of orders in terms of the prohibition on the dissemination of content, the two are technically different, although the terms are often used interchangeably. *See* Brian T. FitzGerald, Note, *Sealed v. Sealed: A Public Court System Going Secretly Private,* 6 J.L. & Pol. 381, 382 n. 7 (1990) (using "confidentiality orders," "protective orders," and "sealing orders" interchangeably throughout the text).

Under Local Rule 10(C), the court "may on written motion and for good cause shown enter an order directing that one or more documents to be used in a proceeding be suppressed...." A "suppressed document" is "a document or an exhibit filed in a proceeding in this Court to which access has been restricted either by a written order, including a protective order...." Local Rule 10(A)(1).

A "protective order" is "an order which provides that certain documents of exhibits to be filed with the court at a future date may be filed

as suppressed or sealed documents as determined by the order." Local Rule 10(A)(5).

A "sealed document," on the other hand, is "a suppressed document which the court has directed to be maintained within a sealed enclosure such that access to the document requires breaking the seal of the enclosure." Local Rule 10(A)(2).

While the purpose of both orders is to ensure confidentiality, a seal order can be seen as more sweeping and inclusive if the entire case is ordered sealed. *See* FitzGerald, *Sealed v. Sealed,* at 382 n. 7, 383 & n. 10, (distinguishing as "total sealing orders" those orders that make the entire record of a proceeding confidential—the identity of the parties, all pre-trial discovery material, the contents of the pleadings, etc.).

In the present instance, there was both a protective order for documents designated as confidential and a seal on the entire case. I have therefore tried, despite their overlap in effect and purpose, to analyze the two types of orders separately. I may, however, refer to them collectively as orders of confidentiality.

settle. I had observed this behavior first-hand over a course of almost two years in the initial *Grove Fresh* suit, No. 89 C 1113, and I watched as this familiar pattern played itself out in No. 90 C 5009. Also vital is the audience to whom the orders were addressed. *Matter of Betts*, 927 F.2d at 986. *See also United States v. Cutler*, 815 F.Supp 599 (E.D.N.Y.1993), citing *United States v. Turner*, 812 F.2d 1552, 1565 (11th Cir.1987). When the audience is a member of the bar, that fact will be taken into account in determining reasonable specificity, and orders that would otherwise require greater specificity for a layperson will require less for a lawyer. *See, e.g., Cutler*, 815 F.Supp. at 607; *Turner*, 812 F.2d at 1565 ("it may well be necessary that the specificity of orders directed to lay-persons be greater than that of orders to lawyers").

Mr. Messina earned a bachelor of arts in social science from the State University of New York at Stonybrook in 1971. He received a J.D. from the Boston College Law School in 1975. During the academic year 1975–1976 he was a teaching fellow at the University of Illinois College of Law. From around 1976 to 1981 he was an associate at the Chicago firm of Jenner & Block. From 1981 until 1987 he was an associate and from July of 1982 to 1987 a partner in the firm of Goldberg, Kohn, Bell, Black, Rosenbloom & Ritz. Since the fall of 1987 he has been a sole practitioner. Mr. Messina is an experienced member of the bar who had reason to be familiar in his past work with orders of confidentiality, as well as the consequences of violating those orders.

Even if Mr. Messina's past general legal experience had not given him a firm understanding about protective orders and seals, his specific experience as leading counsel in the *Grove Fresh* litigation should have filled in that gap. Mr. Messina's understanding of the application of the order is relevant to a proper determination of its scope. *Combs v. Ryan's Coal Co., Inc.*, 785 F.2d 970, 978 (11th Cir.1986); *Duracell Inc. v. Global Imports Inc.*, 660 F.Supp. 690, 692 (S.D.N.Y.1987).

In both *Grove Fresh* suits, Mr. Messina was warned time and again about his conduct. His repeated attempts to circumvent my orders prompted me to observe on 3 May 1991 that it was apparently Mr. Messina's intention to beat one of the defendants in this case "over the head in public with what [he] believe[d] to be wrongdoing." Any proper interpretation and application of the orders requires that they be viewed in connection not only with Mr. Messina's attorney status, but with his past violations and the warnings he experienced during the course of the *Grove Fresh* litigation.[11]

Moreover, given the orders' context, audience, and nature, Mr. Messina's interpretation of them is unreasonable. The prohibition of an order must be subject to reasonable interpretation, and, while a court cannot expand the terms of the order, it may look to the nature of the original proceedings to interpret and apply it. *United States v. Greyhound Corp.*, 508 F.2d 529, 532, 537 (7th Cir.1974). Courts are not and should not be compelled to accept "twisted interpretations" or "tortured constructions" of an order. *Id.* at 532. Furthermore, a court order is issued to be obeyed. In effectuating this purpose, a court should not interpret the order in such a way as to render it a nullity. *Id.* at 533. Rather an order should be interpreted to give effect to its purpose and spirit. *See Chase Industries, Inc. v. Frommelt Industries, Inc.*, 806 F.Supp. 1381, 1386 (N.D.Iowa 1992). Mr. Messina's construction of the or-

---

**11.** Mr. Messina repeatedly filed or attempted to file in a public manner documents that were confidential under the orders of confidentiality. *See, e.g.*, Everfresh's Emergency Motion to Require Grove Fresh to File Its Motion and Reply Under Seal (filed 3 October 1990); Motion to Enforce Prior Orders of Court of Labatt and Everfresh/Canada (filed 1 May 1991); Everfresh's Motion (A) to Enforce This Court's Previous Orders; (B) To Strike and Seal Grove Fresh's Latest Pleadings; and (C) For Sanctions (filed 1 May 1991, and which contains a lengthy list of public filings contrary to explicit orders); Motion to Strike Memorandum Filed by Grove Fresh on January 15, 1993 (filed 20 January 1992, and which resulted in the Memorandum being withdrawn from the Court file by Mr. Messina's co-counsel); Petition of American Citrus Products Corporation and Henry Lang for a Rule to Show Cause Why John P. Messina Should Not Be Held in Contempt for a Violation of This Court's Sealing Order (filed 3 November 1993).

ders is tortured.[12] He interprets the seal as doing nothing more than regulating the public's access to the physical items on file at the clerk's office. Such an interpretation would render the sealing order a nullity by allowing the public to have the words, ideas, and facts contained in protected materials, while denying them access only to the documents which contained them. The purpose of the order is not fulfilled and the conduct at which it is aimed is not curtailed if Mr. Messina's interpretation is accepted.

Moreover, Mr. Messina's interpretation is twisted. By arguing that anything not expressly prohibited by the orders may be revealed, Mr. Messina engages in the fallacy of omission: he claims that he could reveal whatever information he wanted as long as the order on its face did not expressly prohibit it; that anything omitted was allowed. This not only defies common sense, but basically denies any prophylactic effect to orders intentionally written to be broad.

The sealing order, when viewed in conjunction with the protective order, must reasonably be viewed as protecting not just documents, but the contents of those documents. The orders, after all, were intended to protect the defendants against a resolution of this case prompted by Mr. Messina's unauthorized disclosures. That interest would not be served by an interpretation and application of the orders which permitted Mr.

Messina to publicly disclose any information he deemed appropriate, but restrained only his distribution of the documents containing that information.

If Mr. Messina had any doubts about exactly what he could or could not disclose, he had the continued opportunity to seek clarification. When a defendant undertakes his own interpretation of an order, and does not seek clarification, then he proceeds at his peril. Failure to seek clarification of an order, "combined with actions based upon a twisted or implausible interpretation of the order will be strong evidence of a willful violation of the decree." *Greyhound*, 508 F.2d at 532. *See Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1373 (9th Cir.1981). It follows that if one seeks clarification, gets it, and subsequently disregards it, the evidence of a willful violation is even stronger.

Mr. Messina sought clarification of the orders, and on 8 April 1994 I provided it, along with a specific procedure to be followed before any future disclosures were made: Mr. Messina was to present me with a petition setting out the information he sought to disclose, along with its independent public source.[13] In spite of my admonitions, and Mr. Messina's self-professed confusion,[14] he never once attempted to follow the required procedure or even consult me in a more informal manner.[15] I offered Mr. Messina

---

**12.** To listen to Mr. Messina on the scope of the orders is to hear a veritable potpourri of tortured constructions. An example: in the course of a deposition taken 29 August 1991, Mr. Messina stated that he understood the sealing order to protect disclosure obtained during discovery: "[U]ntil we reach an agreement or agree to disagree, the depositions [including this one] are being treated as though they are protected by the seal." Later, in his own deposition, Mr. Messina interpreted the phrase "as though" as meaning "we're going to pretend that it's protected by the seal."

The game of "let's-pretend-the-deposition-was-protected-under-seal-when-it-really-isn't" is typical of Mr. Messina's methods. Not only is it unfair to the other players—i.e., Mr. Messina's opposing counsel—who interpret words less fancifully, but it exacerbates an insidious public stereotype of lawyers as untrustworthy manipulators of language.

**13.** That Mr. Messina knew and understood the procedure I had outlined is evident from his

testimony: "[I]f I needed or wanted to consult with prospective clients ... what I should do is come in with a petition setting forth what it was I wanted to communicate and to identify, in the court's words, chapter and verse the public sources."

**14.** Mr. Messina admitted in Court that there were times when he was "confused" about whether the seal order was intended to apply to depositions and other discovery, but this confusion evidently did not prompt him to seek further clarification. Mr. Messina claims that for the "last year or so of the case I had come to the conclusion that the—the proper or the accurate construction of the sealing order was that it did not apply to discovery...." Given that this conclusion was made in a judicial void, its basis is dubious.

**15.** When asked whether he ever used that procedure during his hearing, Messina admitted he had not: "I thought about using it, and the more I thought about what would have to go into the

unlimited opportunities to clarify the orders' scope as they related to specific disclosures but he chose not to avail himself of these.

Even if Mr. Messina's arguments were credible, I find that Mr. Messina's belief in them at the time is not. Since his interpretations of the orders are both unreasonable and unbelievable, and the result of a voluntarily-enforced ignorance, Mr. Messina is estopped from using them as a defense.

### 2. Constitutionality

■ Mr. Messina also attempts to defend his disclosures from a finding of contempt by arguing that the orders of confidentiality unduly restricted his right to free speech under the First Amendment. But even though the broad sweep of the First Amendment seems to prohibit all restraints on free expression, the Supreme Court has observed that freedom of speech "does not comprehend the right to speak on any subject at any time." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31, 104 S.Ct. 2199, 2206, 81 L.Ed.2d 17 (1984) (citation omitted).

In *Seattle Times*—the most thorough exploration yet by the Supreme Court on orders of confidentiality—it was held that when a protective order is entered on a showing of "good cause" as required by Federal Rule of Civil Procedure 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of information if gained from other sources, it does not offend the First Amendment. *Id.* at 37, 104 S.Ct. at 2209. While the context of the case was somewhat limited, the decision's reasoning strongly suggests that Mr. Messina's First Amendment defense cannot succeed. It is necessary to parse the holding to see why.

Although the *Seattle Times* Court focused exclusively on protective orders issued under Rule 26,[16] it recognized that courts "have inherent equitable power to grant confidentiality orders, whether or not such orders are specifically authorized by procedural rules." *Id.* at 35, 104 S.Ct. at 2209. How broad these equitable powers are is a matter left unexplored by *Seattle Times*, but, since discovery is the focus of both Rule 26 and *Seattle Times*, there is nothing in the opinion to suggest that those equitable powers are likewise limited to protecting discovery materials. Indeed, the reverse appears to be true.

One important reason, the Court said, why "the trial court[s] have substantial latitude to fashion protective orders" is the "unique character of the discovery process." *Id.* at 36, 104 S.Ct. at 2209. An order "prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny" because discovery materials such as pretrial depositions and interrogatories are not considered "public components of a civil trial." *Id.* at 32–33, 104 S.Ct. at 2207.

But the Court did not go as far as to suggest that protective orders which cover a broader variety of materials than those pertaining to discovery are constitutionally infirm. This is especially true for those materials to which access could only be gained by parties to the litigation, since there is "no First Amendment right of access to information made available only for purposes of trying his suit." *Id.* at 32, 104 S.Ct. at 2207. Like discovery materials, the dissemination

---

petition, the more I thought I would only be inviting more problems rather than solving a problem." My feeling is that the problem Mr. Messina most feared he would invite by consulting me was that I would interpret the orders in ways with which he disagreed.

**16.** Rule 26(c) allows for protective orders "on matters relating to a deposition." This has been interpreted more broadly to allow protective orders for all types of discovery materials. *See Seattle Times*, 467 U.S. at 34–37, 104 S.Ct. at 2208–2209.

Under Local Rule 18(A), "discovery materials" includes "all interrogatories, requests for pro-

duction and inspection, requests for admission, and responses and objections made pursuant to [specified] Federal Rules of Civil Procedure, and notices of depositions issued and depositions taken pursuant [to other specified Federal Rules].

The *Seattle Times* holding was specifically limited to those protective orders entered for "good cause" as required under Rule 26(c). *Id.* at 37, 104 S.Ct. at 2209. Whether "good cause" under Rule 26 is to be interpreted differently from whatever the necessary predicate is protective orders issued on another basis need not be decided here, since I believe the orders at issue here satisfy the Rule 26 "good cause" standard. *See infra* part A.3.

of agreements intended by the parties to be confidential carries a "significant potential for abuse" which could "implicate privacy interests of litigants and third parties." *Id* at 34, 104 S.Ct. at 2206. The Court found that such rights and interests were "implicit in the broad purpose and language of the rule." *Id.* at 35 n. 21, 104 S.Ct. at 2209 n. 21.

The goal of protecting the litigants' privacy interests from abuse is as valid in the context of confidential agreements as it is for discovery. Thus, confidential agreements filed during the course of a lawsuit in reliance on an existing seal—such as confidential settlement agreements—are also worthy subjects for a protective order, because, like discovery material, they too cannot really be considered "public components of a civil trial." *See id.* at 33, 104 S.Ct. at 2208. *See also City of Hartford v. Chase*, 942 F.2d 130, 135–36 (2d Cir.1991) (upholding district court's power to prevent access to all documents related to settlement).

And while there is "simply no legitimate public interest" to be served by disclosing settlement agreements, the parties to the agreement are likely to have "a compelling interest in keeping the settlement amount confidential." Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv.L.Rev. 427, 486–87 (1991). In fact, confidential settlement agreements are likely in the long run to best serve the interests of the public and the parties alike: "[W]hatever the value of disclosure, it should not obscure the strong public interest in, and policy objectives furthered by, promoting settlement." *Id.* at 486. Thus, "absent special circumstances, a court should honor confidentialities that are bargained-for elements of settlement agreements." [17] *Id.*

The orders of confidentiality at issue here were not explicitly issued under Rule 26, but there is, and was meant to be, some overlap with Rule 26's protection of discovery materials (an express purpose behind the orders was "to facilitate discovery"). But the scope of my protective orders was meant and understood by Mr. Messina to be broader than the scope of a Rule 26 protective order,[18] covering not only discovery materials, but also other documents considered confidential, including confidential settlement agreements. Orders of such scope are within the trial court's discretion. *See Chase*, 942 F.2d at 135–36.

But for his status as Plaintiff's attorney, Mr. Messina would never have had access to the confidential settlement agreement whose terms he disclosed. He cannot shield the abuse of his insider's knowledge of the settlement amount by references to the Constitution, since orders restricting disclosure of information gained, such as here, purely from inside access to the documents implicate constitutional rights "to a far lesser extent than would restraints on dissemination of information in a different context." *Id.* 467 U.S. at 33–34, 104 S.Ct. at 2208.

Mr. Messina also claims he cannot be punished for disclosing information independently available from a public source. Prohibiting the disclosure of information "gained through means independent of the court's processes" would raise the specter of prior restraint. *Id.* at 34, 104 S.Ct. at 2208. Putting aside the obvious problem of attempting to restrict information presumptively protected by the First Amendment, there are two commonsense policy reasons for not punishing someone from divulging information identical to that contained in a public source. One, it would be inherently unfair; and two, it would be too difficult, when considering sanctions for disclosure, to

---

**17.** As Professor Miller has observed, "[a] number of courts have required a common law right of access when there has been judicial participation in the settlement process, but they have given it extremely different application." *Id.* at n. 290. *Compare Minneapolis Star & Tribune Co. v. Schumacher*, 392 N.W.2d 197, 206 (Minn.1986) (emphasizing the traditional privacy of settlements and the policy favoring settlements) *with Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse*

*Assocs.*, 800 F.2d 339, 345 (3d Cir.1986) (stating that court approval of a settlement is something the public has a right to know about and evaluate).

**18.** As I stated on 27 October, "[o]ne of the reasons that the sealing order was so broad was my concern that Mr. Messina would ignore any order that was not broad."

determine which source—public or protected—was used.

Finding Mr. Messina in contempt in this case for revealing information to which the general public had access would be both unfair and unconstitutional. But my orders certainly cannot be seen as an attempt to prevent the dissemination of public information. Aside from the implicit restraints of the First Amendment on the orders (as per *Seattle Times*), I explicitly exempted the dissemination of publicly available information from the orders' reach in clarifying for Mr. Messina the orders' scope.

However, since it was by no means self-evident exactly which information was or was not independently available from a public source,[19] I required, as part of the procedure Mr. Messina was to follow prior to making further disclosures, that he identify to this court his allegedly independent public source. Putting this burden on Mr. Messina was reasonable,[20] since—unlike his opposing counsel or the court itself—Mr. Messina was in the best position quickly to articulate the nature and location of his public source. Any restraints this procedure might have imposed on Mr. Messina's First Amendment rights were de minimis and ephemeral, and were substantially outweighed not only by the more compelling interests of the parties

seeking confidentiality, but also by the interests of justice and judicial economy.[21]

Mr. Messina voluntarily chose not to avail himself of a procedure personally tailored to meet his needs and protect his rights. Consequently he did not identify to me any independent public sources prior to making his disclosures. Having failed to meet his burden, he is therefore estopped from raising as a defense the alternate availability of a public source.[22]

Moreover, even if Mr. Messina is correct, and some of the information he disclosed was publicly available, this will not necessarily shield him from revealing things which were not. For each of the alleged instances of contempt adequate and independent grounds exist for sanctioning Mr. Messina solely for those disclosures made without a separate public source. Specifically, disclosures concerning (1) the invocation of the Fifth Amendment privilege by certain individuals and (2) the amount of the settlement.[23] Neither piece of information, despite Mr. Messina's insistent and unsupported claims to the contrary, was independently available from a public source.

Because Mr. Messina could "disseminate the identical information covered by the protective order as long as the information [was] gained through means independent of the court's processes," *Seattle Times*, 467 U.S. at

19. Nor necessarily evident to Mr. Messina. As he himself testified, "[O]nce the case was filed ... there was an awful lot of discovery that was redundant with information that I had gotten from public sources. But there was also discovery that provided additional information on subjects that I had gotten from public sources."

20. This burden is not to be confused with the threshold burden of persuasion placed on the designating party to show "good cause" for a protective order under Rule 26(c). *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 166 (3d Cir.1993); *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir.1986) ("Rule 26(c) places the burden of persuasion on the party seeking the protective order. To overcome the presumption, the party seeking the protective order must show good cause...."), *cert. denied*, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987).

Nor is it to be confused with the burden, also borne by the designating party after a challenge to the designation, of proving that the information was appropriately subject to the confiden-

tiality and sealing provisions in the order." *Id.* at 158–59. These burdens had already been surmounted to my satisfaction. Therefore this is not a *Leucadia* situation, where the district court had improperly placed the burden of persuasion on the party seeking access to sealed judicial records, rather than on the designating party, to justify continued secrecy. *See Leucadia*, 998 F.2d at 166–67.

21. Messina argues that the outlined procedure unconstitutionally conditioned his "fundamental right to practice law." Since the practice of a law in the United States is a privilege, not a fundamental right, I do not address this argument.

22. This is especially true for those instances where Mr. Messina claims as "public" information he himself disclosed to the public. *See infra* part B.2.

23. These disclosures are more fully examined *infra* part B.

32–33, 104 S.Ct. at 2207, there was no prior restraint. Mr. Messina's unauthorized disclosures of protected information not gained by independent means are therefore constitutionally valid grounds for contempt.

### 3. Validity

■ If the order underlying it is invalid, a contempt judgment based on a violation of that order may well fall with it. *Marrese v. American Academy Orthopaedic Surgeons,* 726 F.2d 1150, 1157 (7th Cir.1984), *rev'd on other grounds,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). Seeking to take advantage of this rule, Mr. Messina questions the underlying validity of the seal and the protective order as a way of preemptively neutralizing any determinations of contempt.[24] Even assuming that Mr. Messina was permitted to raise the invalidity of the contempt order as a defense during his hearing rather than having to wait to do so on appeal, *see United States v. Pearce,* 792 F.2d 397, 400 (3d Cir.1986), this defense still cannot succeed for the simple reason that the orders of confidentiality are, and were, valid. And "a continuing respect for the valid decrees of a court commands that they be obeyed until changed." *Kindred v. Duckworth,* 9 F.3d 638, 644 (7th Cir.1993), citing *Pasadena Bd. Educ. v. Spangler,* 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976).

■ A district court must independently determine if "good cause" exists before issuing a stipulated protective order. *Jepson, Inc. v. Makita Elec. Works, Ltd.,* 30 F.3d 854, 858 (7th Cir.1994); *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.,* 998 F.2d 157, 166 (3d Cir.1993) ("To overcome the presumption [of public access], the court may construct a broad 'umbrella' protective order upon a threshold showing by one party (the movant) of good cause.") (citation and internal quotation marks omitted). In considering whether good cause exists for a protective order, the federal courts have generally adopted a balancing process.[25] *Pansy*

---

**24.** Assuming for the sake of argument that my orders were invalid, Mr. Messina's reliance on *Marrese* to exonerate him from a judgment of contempt for their violation is problematic. This is not only because there is no single majority opinion of the en banc court, nor even because the case focused exclusively on criminal, rather than civil, contempt. My reservations about the efficacy of *Marrese* as it relates to Mr. Messina's defense are rooted in more fundamental concerns.

First, because as Judge Posner's opinion notes, there are many decisions which hold that a contempt citation remains intact even after invalidation of the underlying order which was violated. *Marrese,* 726 F.2d at 1157. *See also Howat v. Kansas,* 258 U.S. 181, 189–90, 42 S.Ct. 277, 281, 66 L.Ed. 550 (1922); *United States v. Mine Workers,* 330 U.S. 258, 291–94, 67 S.Ct. 677, 694–696, 91 L.Ed. 884 (1947); *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975); *Blocksom & Co. v. Marshall,* 582 F.2d 1122, 1124 (7th Cir.1978).

Moreover, a more recent ruling by this court, and, unlike *Marrese,* one specifically addressed to orders of confidentiality, held that a "confidentiality order is effective until modified; the collateral bar doctrine requires litigants to obey invalid orders while they are outstanding." *Matter of Krynicki,* 983 F.2d 74, 78 (7th Cir.1992), citing *Pasadena Bd. of Educ. v. Spangler,* 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976). Even though *Krynicki* did not specifically refer to contempt, the enunciated rule would have no teeth if its violation could not be remedied through contempt sanctions. The unavoidable inference of *Krynicki* therefore is that *Marrese* does not include protective orders within its scope.

Second, Judge Posner attempted to reconcile the apparent contradiction in the lines of precedent by noting that in those cases where the validity of the underlying order was held not to be reviewable on appeal from the judgment of contempt, the order could have been appealed as of right directly, or otherwise reviewed other than by appeal from the contempt judgment. *Marrese,* 726 F.2d at 1157. Discovery orders, like the one at issue in *Marrese,* are not appealable. *Id.* But not only are orders of confidentiality appealable independent of any contempt judgment, the orders in this very case were actually appealed to the Seventh Circuit. *See Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 898–99 (7th Cir.1994). Thus, the orders at issue here fall outside the *Marrese* rule, and even a finding that the underlying order was invalid would not shield Mr. Messina from being found in contempt for its violation. *See Maness,* 419 U.S. at 458, 95 S.Ct. at 591 ("Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.").

**25.** The Third Circuit recently has summarized a non-exhaustive list of factors to be considered in the balancing process. These include (1) whether parties have an interest in privacy; (2) wheth-

*v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir.1994), citing Miller, *Confidentiality*, 105 Harv.L.Rev. at 432–33. When a district court carefully considers "each of the factors which favor[ ] access or continued secrecy for the documents at issue" and assigns "appropriate weights to the various interests," there is no abuse of discretion. *Leucadia*, 998 F.2d at 167, citing *Littlejohn v. BIC Corp.*, 851 F.2d 673, 685 (3d Cir.1988).

■ In deciding to seal a case, a district court should articulate the findings and reasoning that served as a basis for the seal. *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 898 (7th Cir.1994). But, since an absence of those findings and reasoning in the record is not necessarily evidence that a court never considered good cause, the real question is whether or not there was any substantive decision behind the record's "silence."

■ If the lack of articulated findings stems from a complete failure to make a good cause determination, the order is likely to be found invalid. *See Jepson*, 30 F.3d at 859. The consequence of that would be the reversal of any sanctions imposed for violating the order now adjudged to be invalid. *See id.* In *Jepson*, the Seventh Circuit reversed the district court's imposition of sanctions against counsel for disclosing information subject to a stipulated protective order because it determined that the underlying order was invalid. *Id.* at 858–60. The Court was not only disturbed by the lack of any implicit or explicit reference to "good cause" in the order itself, but also by the fact that no specific finding of this appeared anywhere in the record. *Id.* at 859.

Reversal in *Jepson* was appropriate because there was "*no* indication that the magistrate judge made some independent determination that 'good cause' existed before issuing its [protective order]." *Id.* at 858–59 (emphasis added). But while the rationale for sealing cases should ideally be put on the record at the time of the sealing, the Seventh Circuit has "yet to hold that where such a description is [initially] lacking, reversal is per se appropriate." *Grove Fresh*, 24 F.3d at 898.

The Court of Appeals will independently determine if good cause existed only if the lower court obviously did not. *See Jepson*, 30 F.3d at 859. *See also Leucadia*, 998 F.2d at 167 ("The required balancing should be done in the first instance by the district court"). In this circuit, the preferred method to see whether good cause was determined (if not recorded) is to remand the matter back to the authorizing court. *See Grove Fresh*, 24 F.3d at 898. If on remand the district court can specify the basis for its sealing order, the order cannot be invalidated—and the sanctions for violating the order reversed—for a complete failure to decide good cause. *See Jepson*, 30 F.3d at 860. Moreover, the Court of Appeals will then have findings specific enough to "determine whether the closure order was properly entered." *Grove Fresh*, 24 F.3d at 898, quoting *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1985).

■ The court in *Jepson* was dealing with a stipulated protective order that was never submitted to the district court, never signed by it, and never entered. *Id.* at 856–57. How much weight this played in the Seventh Circuit's reasoning is unclear,[26] but

er information is being sought for legitimate purpose or for improper purpose; (3) whether there is a threat of serious embarrassment to a party; (4) whether information is important to public health and safety; (5) whether sharing of information among litigants would promote fairness and efficiency; (6) whether a party benefiting from the confidentiality order is a public entity or official; and (7) whether the case involves issues important to the public. *Pansy*, 23 F.3d at 787–88. As the record in the instant case shows, I felt that any presumptive right of access possibly merited by (4) was substantially outweighed by (1), (2), and, to some extent, (3). Although

information concerning public health and safety was implicated—this being a case involving the adulteration of orange juice—I was not convinced by the evidence before me at that time that (4) merited greater weight. Factor (7) overlapped with (4), and the two were considered together. Factors (5) and (6) were not relevant in this case, and were therefore not considered in my balancing of the interests.

26. Unclear partly because there were two protective orders at issue in the case: a stipulated protective order that the district court never saw and an interim protective order that was signed

from the opinion this fact was considered. *See id.* at 856. Here, of course, the stipulated protective order at issue was submitted to me, I did sign it, and it was entered. And although I never actually used the phrase "good cause" to justify my reasons for signing it, the record amply attests to an independent determination of good cause, including a balancing of interests, which justified the seal as well as the protective order.[27]

Given the purpose for the orders, the context in which they were issued, and the balancing of the respective interests, the orders are valid: there was good cause to find good cause. However, even assuming that the orders were invalid, Mr. Messina may still be punished for violating them. *Krynicki*, 983 F.2d at 78 (holding litigants must obey even invalid outstanding orders of confidentiality). Any alleged invalidity of the underlying orders would not affect the validity of a contempt judgment for their violation.

### B. Violations of the Orders of Confidentiality

#### 1. Disclosures in Appellate Brief

██ The first charge of contempt against Mr. Messina stems from a forty-two page brief he filed with the Seventh Circuit Court of Appeals on 22 October 1993.[28] Within the brief, defendants American Citrus and John Labatt allege, Mr. Messina disclosed protected information that was not available from public sources and which could only have come from the discovery process in the case.

Specifically, Messina is charged with having asserted that certain defendants, or representatives of defendants, invoked the Fifth Amendment privilege against self incrimination. Moreover, it is alleged that Messina mischaracterized the record by asserting that other individuals had invoked the Fifth Amendment (and stating that adverse inferences should thereby be drawn against the corporate defendants) when in fact they had not, thus making Messina's disclosures to the Seventh Circuit deceptive as well as improper.

A perusal of the brief in question shows the above charges to be true: the disclosures about the Fifth Amendment were made, the disclosures were improper because the disseminated information was protected by both the seal and the protective order, the information was unavailable from any independent public source, and inaccuracies in that which was divulged distorted the record. Mr. Messina's revelations are all the more egregious for having been made with full knowledge—as he admitted under cross-examination—that at the time he made his disclosures I then had before me a motion in support of keeping under seal the very issues he disclosed.

The orders in this case were entered lawfully and were reasonably specific. Mr. Messina violated those orders, and the violation of those orders was willful. There are no valid defenses to his actions. The evidence of Mr. Messina's violation of the orders here is more than clear and convincing, it is beyond a reasonable doubt. Since the elements and the standard of criminal contempt are met, and since what will satisfy the stricter criminal contempt standards will necessarily satisfy its civil counterpart, the same acts by Mr. Messina may yield sanctions for both criminal and civil contempt.

For this first instance of civil contempt, I order Mr. Messina to compensate the parties for losses they can prove resulted from noncompliance, including attorney's fees and

---

by the magistrate judge without considering good cause. *See Jepson, Inc.*, 30 F.3d at 856. Judge Kanne's analysis does not always distinguish between the two. *See id.* at 859. Perhaps this is because the orders overlapped to a certain extent, *id.* at 856, and perhaps because the attorney was sanctioned pursuant to a Motion for Enforcement of Protective *Orders* [plural] and for Sanctions. *Id.* at 857 (emphasis added). As both orders were involved, and as their purposes overlapped, the Court may have felt it expedient to treat them for purposes of analysis as interchangeable.

27. Ironically, I elaborated on my reasons for issuing the orders one month prior to the Seventh Circuit's request that I "specify the basis" for the seal.

28. At the time of filing, Mr. Messina was neither a party, nor an attorney for any party, in the Grove Fresh litigation. The Seventh Circuit struck the motion as frivolous, and asked him to show cause why he should not be sanctioned for improper conduct. Sanctions against Mr. Messina for mischaracterizing his attorney status and his standing are discussed *infra* part D.

costs incurred in preparing and prosecuting Mr. Messina for contempt (this may include overhead and support personnel). The defendants shall submit for review the total amount of this compensation within two weeks from the date of this opinion.

And for this first instance of Mr. Messina's criminal contempt, which not only subverted the authority of the court, but also wasted its time (and therefore the taxpayers money), I fine him $1000. This amount, which is meant to compensate the government as well as to punish Mr. Messina's disobedience, is due within three days after the issuance of this opinion, and shall be paid by a certified check made out to "the United States of America."

### 2. Disclosures in Letter

 The second contempt charge against Mr. Messina stems from a letter, dated 20 September 1994, written by Mr. Messina to John Elson, of the Northwestern University Legal Clinic, counsel for the Ad Hoc Coalition of In Depth Journalists, an intervenor. In this letter, defendants claim, Mr. Messina disclosed—and substantially mischaracterized—information obtained from discovery, and quoted verbatim from the sealed complaint.

Instead of consulting with me, as he was advised to do before making further disclosures, Mr. Messina—perhaps attempting to save this court the time and trouble of deciding the matter for itself—decided the legal issues on his own. Thus he begins his letter by unequivocally stating that the designations about materials to remain under seal are "not well grounded in fact," and that "[a]fter careful review of the applicable law and the procedural history of the seal in the *Labatt* case, I have concluded that I am free to provide you with [the] information ... set out below." And provide it he did.

At page 4, arguing that the settlement terms were no longer confidential and therefore did not justify closing the post-settlement proceedings, Mr. Messina disclosed the confidential settlement amount, which was part of the sealed record.[29] In doing so, he violated not only the orders of confidentiality, but also prejudiced the interests of his client by knowingly and willfully violating the terms of the confidential settlement agreement itself.[30]

At pages 6 through 8, arguing that American Citrus' objection to certain designations were groundless,[31] Mr. Messina revealed potentially disparaging and scandalous designations contained in the sealed complaint. Messina admitted under cross-examination that at the time he disclosed this information he knew that keeping those particular designations under seal was then an issue before me awaiting decision.

Also at page 6, Mr. Messina revealed that certain individuals had invoked the Fifth Amendment privilege against self-incrimination. This information was exclusively contained in discovery materials covered by the seal and the protective order.[32]

---

**29.** These disclosures were justified, Mr. Messina argues, because this information was "public." But he eventually (and reluctantly) admitted under cross-examination that the information was public only because of disclosures he made in his motion to the Seventh Circuit: "The information about the settlement amount [as published in national press] certainly came from my papers."

Thus, Mr. Messina attempts to defend his actions by claiming as "public" protected information he himself disseminated to the public. The circularity of his argument is audacious, even by his own standards of audacity.

**30.** Under cross-examination Mr. Messina admitted he understood that the settlement agreement between the defendants and Grove Fresh contained confidentiality provisions, that one of the terms that was to remain confidential was the amount of the settlement, and that the amount was defined as one of the material terms to remain confidential. He also admitted he knew that the defendants did not want the information disclosed, that confidentiality is valuable, and that he understood the value of confidentiality in an agreement.

**31.** These designations, which plausibly had negative connotations, referred to the adulterated orange juice formula and the organization which utilized it.

**32.** Mr. Messina tries to claim that this information was unrelated to discovery, since it was supposedly information contained in a letter from one of the defendant's attorneys. But after much waffling, he finally admitted under cross-examination that the letter was only written in response to a deposition notice issued by Grove Fresh. Such a response was unquestionably related to discovery.

At page 7 of his letter Messina quoted paragraphs 99, 100, and 102 of the complaint, which was then under seal. The quotes were verbatim.

At page 8, arguing that American Citrus' objection to the naming of non-party co-conspirators was groundless, Messina disclosed the identity of eight individuals named in the sealed complaint who he alleged were co-conspirators. He did this even though, as he admitted under cross-examination, he knew that the identification of these individuals—and the issue of whether this information should be made public—was the subject of a brief before me, for which the parties were presently awaiting a judgment.

Again, I find that Mr. Messina willfully violated reasonably specific orders beyond a reasonable doubt. Again, there are no valid defenses to Mr. Messina's action. Again, both civil and criminal contempt sanctions are appropriate. These sanctions, for this second instance of contempt, are identical to those previously cited: compensation for the parties' losses and a fine exacted on behalf of the United States.

### 3. Disclosures in Conversation

The third alleged instance of contempt springs from Mr. Messina's disclosure of protected information to a reporter for a national publication, resulting in a front page story revealing the contents of his disclosures. *See* Diana B. Henriquez, *10% of Fruit Juice Sold in U.S. Is Not All Juice, Regulators Say,* N.Y. Times, Oct. 31, 1993, at A1.

Messina admitted in deposition that he had a private conversation with Diana Henriquez, the article's author, in which he divulged that certain named individuals had invoked the Fifth Amendment privilege. At the time he made his disclosures, that information was exclusively available from nonpublic, protected discovery materials. Moreover, Mr. Messina testified that he directed Ms. Henriquez to his recently filed Seventh Circuit brief, where the newly "public" information about the settlement amount was immediately discoverable. This amount appeared in the story. *Id.* at A11.

Once again, I find that Mr. Messina willfully violated reasonably specific orders beyond a reasonable doubt; that no valid defenses exist to his actions; and that both civil and criminal contempt sanctions are appropriate. The sanctions for this third instance of contempt are identical to, but separate from, those mentioned previously.

### 4. Future Disclosures

Two recent instances of Mr. Messina's behavior make me question whether Mr. Messina has the necessary self restraint to curb his seemingly uncontrollable propensity to disclose protected materials. The first concerns a "press release" which Mr. Messina drafted, sent to the defendants on 24 January 1995, and threatened to disseminate on 27 January 1995. Headlined "Orange Juice Companies Seek to Punish Lawyer Who Uncovered Consumer Fraud," this "press release" disclosed the invocations of the Fifth Amendment privilege, as well as substantial (and often inaccurate) information about the settlement negotiations, including disclosures of communications with the Court, and with Mr. Messina's former client and co-counsel.

Whether Mr. Messina's methods are seen as tough negotiation or blackmail, his bad faith is evidenced by his threat to send his "press release" not only to the press, but to the Plaintiff's Bar as well. (Although he denied this particular audience was chosen to raise the specter of additional lawsuits against the defendants, he was unconvincing.) Mr. Messina evidently had no compunctions about coercing compliance with his demands by threatening the disclosure of protected information. And there is no question that he would have followed through with his threat: under cross-examination, Mr. Messina admitted that, absent compliance or a court order, "the press release would have been issued."

As disturbing as is Mr. Messina's willingness to hurt his perceived enemies, it pales beside his willingness to run roughshod over the best interests of his client. This incident prompted the sad spectacle of Mr. Messina's former client, Grove Fresh, filing a motion to preclude him from filing his "press release." Perhaps Mr. Messina felt no loyalty to Grove

Fresh since he had been "relieved" of his assignment, but no client—present or former—should be treated the way Mr. Messina treated Grove Fresh. Had he been class counsel, I would have afforded him no fees, because he was seemingly incapable of placing his client's interests above his own.

The second recent incident which makes me question Mr. Messina's ability to restrain himself from future violations concerns his recent spate of filings—nine documents filed between 9 March and 27 April 1995—with the Seventh Circuit. Seemingly impervious to the fact that among the questions currently before this court (indeed the subject of part of this opinion) are Mr. Messina's previous disclosures in an appellate brief of the confidential settlement amount, Mr. Messina, in his latest publicly-filed Seventh Circuit briefs, once again blithely discloses the confidential settlement amount. *See, e.g.,* John Messina's Motion to Consolidate Appeals and Briefing Schedules at 3 (filed 24 April 1995).

These latest happenings prompt more than a sense of déjà vu. Such a shamelessly willful subversion of this court's authority and business, performed with such reckless abandon, engenders the two feelings which Aristotle believed created the catharsis which accompanied great tragedy: fear and pity. *See Poetics* at 230. Fear that Mr. Messina will continue to disregard this court's express orders, and pity that in doing so he teeters so precariously on the abyss.

To save the *Grove Fresh* defendants from a significant risk of repetition of future disclosures (which from the evidence is clear and convincing), and perhaps to save Mr. Messina from himself, I require Mr. Messina to post a $50,000 bond for the next five years. Perhaps the forfeiture of this amount for future violations will give Mr. Messina something his tragic cousin Hamlet had in abundance: pause.

### C. Failure to Appear

■ The fourth contempt charge against Mr. Messina stems from his failure to show up in court, as ordered, on 21 October 1993. The circumstances behind the nonappearance are as follows:

On 20 August 1993, Everfresh filed a Motion to Enforce Settlement Or Relief From Judgment. When the motion was initially called, Mr. Messina did not appear. The Court ordered that either Mr. Messina or his legal representative appear in response to the motion when next heard, which was set to be 1 September 1993. As he acknowledged in both his deposition and hearing testimony, Mr. Messina was expressly advised of this order.

The matter was then put over at the request of Mr. Messina's lawyer. By letter dated October 5, 1993, Mr. Messina was informed that the Court would not be in session until 18 October 1993, but that the Everfresh motion would be called shortly thereafter. This was the same motion for which Mr. Messina had earlier failed to appear, and for which the court had ordered his appearance.

On 12 October 1994, Mr. Messina received formal notice that the Everfresh motion had been re-noticed to be heard on 21 October 1993. Mr. Messina admitted in court it was served on him and that he knew the renoticed motion was the same as that for which he was ordered to appear on 1 September 1993.

On the evening of 20 October, Mr. Messina decided he would not appear as ordered. Shortly after 6 a.m. on the morning of 21 October Mr. Messina faxed a letter to counsel for defendants "as a courtesy to let you know that I do not plan to attend the hearing which you have noticed [today]." (A similar courtesy was not extended to the court, which was given no advance notice of his planned absence.) In response, Mr. Messina received a letter reminding him of his obligation to appear as ordered. Although again put on notice that his appearance was required, Mr. Messina failed to show up.

■ An order requiring a court appearance will flunk the "reasonable specificity" requirement for a contempt finding if the language of the order leaves any doubt or uncertainty that an appearance is required. *See Matter of Betts,* 927 F.2d 983, 987 (7th Cir.1991). If a court order is ambiguous, it precludes the essential finding in a criminal contempt proceeding of willfulness. *Id.* In *Betts,* the criminal contempt conviction was

reversed because the docket order did not state that an appearance was "*de rigueur.*" *Id.* at 988.

Mr. Messina's excuses for his nonappearance are many and varied.[33] Given the evidence, few of them are plausible, many are disingenuous, and several are flatly contradicted by the chronology. None of them provides Mr. Messina with any real defense. After watching him testify, and after reviewing the record, I am convinced beyond any doubt that Mr. Messina had proper notice, fully understood his appearance was required, and knew the reasonable consequences of his actions.

I find not only that Mr. Messina's choice not to appear was willful, but that it was made in bad faith. The evidence convincingly suggests Mr. Messina's nonappearance was motivated by a desire to prevent an order of this court: specifically, that he avoided the hearing so this court could not stop him from filing in the Seventh Circuit a brief on which he had been working for several weeks. On the day he was scheduled to appear, Mr. Messina instead had his affidavit for the brief notarized. On the following day, he filed the brief itself. I do not find the timing of all these events coincidental.

I find yet again that Mr. Messina willfully violated reasonably specific orders beyond a reasonable doubt; that no valid defenses exist to his actions; and that both civil and criminal contempt sanctions are appropriate. The sanctions for this instance of contempt is identical to, but separate from, those mentioned at the end of parts B.1–B.3: compensation to the defendants and a fine payable to "the United States of America."

### D. Misrepresenting Attorney Status and Standing to Seventh Circuit

The fifth charge against Mr. Messina, which stems from the motion Messina filed with the Seventh Circuit Court of Appeals on 22 October 1993, potentially carries sanctions not for contempt but for violations of Rule 11 of the Federal Rules of Civil Procedure.[34] Defendants charge that Mr. Messina made material misrepresentations to the Court, fudging his status as an attorney in the Grove Fresh litigation in order to claim standing to make a personal motion.

The relevant chronology is as follows:

On 21 January 1993, the president of Grove Fresh wrote a letter to Mr. Messina informing him that he was "hereby relieved of all responsibility in the handling of this matter [the *Grove Fresh* litigation]. [Two other attorneys] will act as our sole attorneys and trial lawyers."

Then, on 22 October 1993, nine months after being discharged by his client, Mr. Messina filed a motion with the Seventh Circuit asking for a hearing to respond to allegations about him in defendants' brief. Mr. Messina didn't file any type of motion to intervene in the case or move for leave to file a motion regarding allegations of misconduct, but instead proceeded to file his motion on the theory that he had standing. In paragraph 1 of his motion in the Court of Appeals, Mr. Messina stated:

not make "a serious effort to plead fraud," and, since the court would only be involved as a mediator, he "respectfully decline[d] to participate voluntarily in any mediation process."

---

**33.** His first excuse is that because he never actually received an order signed by the judge requiring him to appear, he was not obliged to attend. (This conclusion was based on his status as "an attorney with about 17 years of experience at the Bar.") Mr. Messina's second excuse is that he discovered at the eleventh hour that his attorney could not appear on his behalf, and he did not think it "wise to appear without counsel."

Excuses three and four are found in his letter of 21 October 1993, sent the day he was due to appear. The third excuse is that the court did not have jurisdiction over him. The fourth is that the motion was not well-grounded in fact, and therefore he not have to appear in what he assumed was a voluntary mediation process. The fifth is that the bare bones 60(b) motion did

**34.** Rule 11 applies to "[e]very pleading, written motion, and *other paper*" signed by the attorney. Fed.R.Civ.P 11(a) (emphasis added). Briefs submitted to the Courts of Appeals, as well as those filed in district court, come within the scope of Rule 11, since the term "other paper" in Rule 11 "includes notices of appeal and appellate briefs...." *Thornton v. Wahl*, 787 F.2d 1151, 1153 (7th Cir.1986), *cert. denied*, 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986) Thus, Rule 11 applies to the certifications made by Mr. Messina in his appellate brief.

Petitioner [Messina] is one of the attorney's of record for plaintiff, Grove Fresh Distributer's, Inc.

Moreover, in both the motion itself and in the accompanying affidavit, Mr. Messina refers to himself as "the Grove Fresh attorney" or "Grove Fresh's attorney," and to Grove Fresh as "his client." Nowhere in either document did he mention being relieved of all responsibility for the *Grove Fresh* litigation.

On 28 October 1993, in response to a motion by Mr. Messina that was before me, Grove Fresh sought to distance itself from its former counsel's actions:

Grove Fresh Distributer, Inc. (Grove Fresh) did not authorize the filing of [Mr. Messina's motion]. Nor was the motion made on behalf of Grove Fresh. Mr. Messina was discharged as Grove Fresh's attorney on January 21, 1993. Although Mr. Messina has apparently not withdrawn his appearances in these cases, Mr. Messina has not been authorized to act on behalf of Grove Fresh since his discharge.

Even after Grove Fresh went on record disavowing a connection with him, Mr. Messina failed to either seek leave to withdraw as attorney of record or to amend his brief so that his stated attorney status more accurately conformed to his ex-client's conception of their relationship.

In an order dated 9 November 1993, the Seventh Circuit denied Messina's motion and granted motions by American Citrus, Labatt, and Everfresh to strike certain documents. The Court also asked Messina to show cause, pursuant to Federal Rule of Appellate Procedure 46(c), as to why he should not be sanctioned for filing a frivolous motion.

On 15 November 1993, American Citrus filed a motion in the Seventh Circuit for disciplinary action against Messina for misrepresenting his attorney status. The Court of Appeals, in an order dated 14 December 1993, denied this motion because "[t]he relief requested is appropriately sought in the district court."[35]

Finally, on 21 January 1994, American Citrus and Labatt filed a joint memorandum in support of sanctions against Messina for, among other things, his misrepresentations to the Court of Appeals. The defendants pray for the court to impose appropriate monetary sanctions for Mr. Messina's misrepresentations.

Rule 11 requires that all pleadings and motions of a party represented by an attorney be signed by that attorney, certifying

that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact ... warranted by existing law ... [and] not interposed for any improper purpose. . . .

Fed.R.Civ.P. 11(b); *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir.1988). It also provides that appropriate sanctions "*shall* be imposed if its provisions are violated." *Goka v. Bobbitt*, 862 F.2d at 650. The district courts are "best acquainted with the local bar's litigation practices and thus best situated to determine when a sanction is warranted to serve Rule 11's goal of specific and general deterrence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990).

Mr. Messina violated Rule 11 in three ways, each of which would be independently sanctionable. First, because the recitation of his attorney status was not well grounded in fact. It would be reasonable, from Mr. Messina's representations in his brief and supporting affidavit, to infer that at the time of filing he was Grove Fresh's attorney in the *Grove Fresh* litigation. Reasonable, given what Mr. Messina says, but incorrect, given the material facts he omits.

Mr. Messina states in the first paragraph of the brief that he "is one of the attorney's of record for plaintiff, Grove Fresh Distributer's, Inc." Local Rule 3.15 states that "[o]nce an attorney has filed an appearance form pursuant to General Rule 3.14 he/she is the attorney of record for the party represented for all purposes incident to the proceeding in which the appearance was filed."

---

**35.** The Court of Appeals may have wished only that I make the findings of fact which would have allowed it to sanction Mr. Messina on its own, under Fed.R.App.P. 38. If this is the case, the Court may, of course, vacate my disposition of the matter and substitute its own.

Moreover, "the attorney of record may not withdraw ... without first obtaining leave of the court." *Id.* An attorney who does not request and obtain leave to withdraw is still considered the attorney of record. *See Daniels v. Brennan,* 887 F.2d 783, 784–85 (7th Cir.1989). Thus, Mr. Messina's statement that he "is an attorney of record" is technically true.

But even if technically true, the placement of this statement (the first paragraph) and the use of the present tense ("is") implies a connection with both case and client that Mr. Messina no longer enjoyed. The misleading illusion that Mr. Messina was then currently representing Grove Fresh is perpetuated by Mr. Messina's numerous references—in both the brief and his supporting affidavit—to himself as "Grove Fresh's attorney" and Grove Fresh as "his client."

To make the illusion complete, Mr. Messina omits anything that might possibly contradict it. This silence is as misleading as anything that Mr. Messina says. Nowhere in the documents filed by Mr. Messina with the Seventh Circuit, including his forty-two page brief and thirteen page affidavit, does Mr. Messina mention the material fact that he was no longer Grove Fresh's attorney, was no longer working on the case, and had been discharged by Grove Fresh nine months earlier. Mr. Messina splits many linguistic hairs to exonerate himself, claiming that he did not consider himself to have been "discharged," merely "relieved of all responsibilities." Such distinctions are worse than implausible: they are insulting.

Mr. Messina claims he was simply trying to identify his relationship to the matter. But since he admitted he was acting on his own behalf, and filing on his own behalf, and the brief concerned not Grove Fresh but him personally, troubling questions arise: Why did he feel the need to describe his past relationship with a former client? And if he felt the need to do so, why not disclose he had been discharged—or relieved—by Grove Fresh? Given Mr. Messina's inclination for disclosing information I find it revealing—and not accidental—that he chose this particular occasion to be silent.

Having watched an evasive Mr. Messina under cross-examination waffle over his reasons for omitting the obvious, I cannot choose but to disbelieve them. Not just because of his long experience as a lawyer, and his demonstrated sensitivity to how false impressions may be fostered by relevant omissions,[36] but also because he admitted that for the purposes of the existing *Grove Fresh* litigation—and his appeal—he understood he was no longer a Grove Fresh lawyer, yet chose not to amend or withdraw as attorney of record after Grove Fresh voiced its objections. Mr. Messina's (implied) attorney status, therefore, is not well-grounded in fact for Rule 11 purposes.

Second, Mr. Messina violated Rule 11 because he certified the matter was filed with a proper purpose when it was not. Mr. Messina's purpose in mischaracterizing his status was improper: to piggyback his personal appeal onto the *Grove Fresh* suit to obtain a semblance of personal standing. Mr. Messina's long experience as a lawyer, if not the reasonable inquiry required by Rule 11, should have alerted him not only to the impropriety of appealing a personal matter without personal standing, but of filing an appeal before the issues had been properly placed before the district court. I find his protestations to the contrary are as disingenuous as the means by which he chose to approach the Court of Appeals.

■ Third, Mr. Messina violated Rule 11 because the filing of his brief was not warranted by existing law. It was, in fact, precluded by it. A person who brings an appeal must have standing to do so. *Moy v. Cowen,* 958 F.2d 168, 170 (7th Cir.1992). It is a well-

---

**36.** For example, in the very appellate brief in question, Mr. Messina argues that the defendants, in a Seventh Circuit brief of their own, wrongfully accused him of professional misconduct through "false statements and innuendoes created by the omission of relevant and material facts." Mr. Messina makes much of what the defendants "failed to disclose" and "falsely imply," and he goes into some detail over their alleged use of "misleading half-truth[s] to create [a certain] impression." Mr. Messina's evident awareness of the potential of language to mislead makes his own silences all the more suspicious, and his attempts to hold others to a standard which he himself did not follow all the more reprehensible.

settled rule that "only parties to a lawsuit, or those that properly become parties, may appeal an ·adverse judgment." *Marino v. Ortiz,* 484 U.S. 301, 304, 108 S.Ct. 586, 588, 98 L.Ed.2d 629 (1988). In most cases, this means parties of record at the time the judgment was entered, including those who have become parties by intervention, substitution or third-party practice. *In re VMS Ltd. Partnership Sec. Litig.,* 976 F.2d 362, 366 (7th Cir.1992). *But see In re Proceedings Before Federal Grand Jury,* 643 F.2d 641, 643 (9th Cir.1981). Moreover, Local Rule 43 maintains

> [n]o pleading, motion, or other document shall be filed in any case by any person who is not a party thereto, except by leave of Court first had and obtained....

Mr. Messina was not a party to the action, did not then represent a party to the action, and had no adverse judgment to appeal.[37] A reasonable inquiry into the law would have shown Mr. Messina that he had no standing to appeal. There was no reasonable basis for his believing otherwise. After listening to Mr. Messina, and sifting through the record, I believe he filed not inadvertently or by mistake, but with the intent to deceive the Seventh Circuit into believing he had standing when he knew in fact he did not.

Since Mr. Messina's brief was not well grounded in fact, was certified for an improper purpose, and was unwarranted by existing law, I find he violated Rule 11. I therefore fine Mr. Messina $1000, and require him to compensate the *Grove Fresh* defendants for any expenses incurred in addressing the Seventh Circuit filing.[38]

### Summary

To sum up, I find Mr. Messina in contempt of this court for his actions in four separate instances. For his acts of civil contempt, Mr. Messina is ordered to compensate the parties for losses resulting from his noncompliance, including attorney's fees and costs incurred in preparing and prosecuting Mr. Messina for contempt (this may include overhead and support personnel). The defendants shall submit to me for review the total of these compensatory fines within two weeks from the date of this opinion.

For each of his four acts of criminal contempt, Mr. Messina is ordered to pay $1000 to "the United States of America."

Since there is a significant risk of repetition of Mr. Messina's disobedience of court orders, I require Mr. Messina to post a $50,000 bond for the next five years, with the admonition that any future disclosures—made without first consulting me and proving an independent public source—will lead to forfeiture of this amount, if not further sanctions.

Finally, for his violations of Rule 11, I fine Mr. Messina $1000, and require him to compensate the other side for the costs they have incurred.

### Conclusion

In tragedy, the dénouement "should arise out of the plot itself...." *Poetics* at 242. And so it does here: the sanctions imposed by this court on Mr. Messina arise naturally from his own errors of judgment. Like the ultimate fate of the great figures of literature, the spectacle of an experienced attorney brought so low by his own actions serves as a cautionary tale to others, and inspires the cathartic emotions of fear and pity recognized by Aristotle as the hallmarks of tragedy.

---

**37.** Mr. Messina's "appeal" was really a request for an evidentiary hearing and a declaration that a consulting agreement he signed was void.

**38.** Although I am sanctioning Mr. Messina under Rule 11, Rule 11 "is not the exclusive source for control of improper presentations of claims, de-fenses, or contentions." Fed.R.Civ.P. 11 advisory committee's notes, 1993 amendment. My analysis would also support sanctions under the court's inherent powers or under 28 U.S.C. § 1927, and I summon both as alternate authority for the sanctions.